In re ESTATE of Charles A. CROMWELL, Deceased.

Robert E. MURRAY, Claimant, Respondent,

v.

Charles A. CROMWELL, Jr., Successor Executor of the Estate of Charles A. Cromwell, Deceased, Appellant.

No. 35707.

Missouri Court of Appeals,
St. Louis District,
Division 4.

April 1, 1975.

Love & Lacks, Thomas K. Edelmann, Clayton, for appellant.

Muehlenkamp & Murray, V. Jack Muehlenkamp, St. Louis, for respondent.

NORWIN D. HOUSER, Special Judge.

The question is the propriety of an order of the circuit court allowing Robert E. Murray an attorney's fee of $5,800 for services rendered Janice Joy Yadon, executrix of the Estate of Charles A. Cromwell, Deceased. Charles A. Cromwell, Jr., as successor executor, asserts error in finding that claimant was entitled to any fee for his services in connection with the estate; claims that the attorney "improperly advised the executrix of the estate with regard to her ability to sell corporate stock which was an asset of the estate, causing direct economic loss to the estate," and that the court erred in refusing to so find.

Mr. Cromwell died testate February 2, 1969, leaving a daughter, Janice Joy Yadon, named executrix in the will, and a son, Charles A. Cromwell, Jr. On February 3 Mrs. Yadon employed claimant, Robert E. Murray, an attorney, to represent her. The estate, which was substantial, consisted principally of corporate stocks. Mrs. Yadon discharged claimant as her attorney on June 3, 1970.

Between February 3, 1969 and June 3, 1970 claimant, according to his testimony, spent 189 hours performing services for the estate, as follows: Preparation and/or filing papers in connection with the appointment of the executrix; initial and supplemental inventories; several petitions for partial distribution; semi-annual and annual settlement; federal and state income tax returns; federal estate tax return, and petitions and settlements and notices for final discharge. He negotiated for the settlement of an automobile accident claim; negotiated the sale of the stock of a closely held corporation and arranged for transfer of the stock; handled claims; placed various claims and motions on the probate court dockets. He testified that on the date of his discharge there was in the estate a cash balance of $209,599, warranting an attorney's fee of $6,314 under the statutory minimum fee schedule; that when discharged there remained to be done to close the estate legal work reasonably worth $500.

Executrix denies that claimant is entitled to any fee for the reason that he misadvised her with respect to the sale of the Fedders stock, one of the principal assets of the estate, as a result of which the estate sustained financial loss.

The circuit judge, on his own motion, caused a jury to be empanelled to act in an advisory capacity. Five interrogatories were submitted to the jury. The gist of the interrogatories and the jury's answers follow:

1. Were any of the services or actions rendered or performed by the attorney wrong, improper or injurious to the estate? Answer: Yes.

2. Did the estate suffer economic loss as a direct result of wrong, improper, or injurious actions of the attorney? Answer: Yes.

3. Did the attorney wrongfully advise the executrix that she could not sell the stocks in the estate on either January 12, 1970, or February 17, 1970, or April 6, 1970? Answer: Yes.

4. Did the executrix, at any time between January 1, 1970 and April 6, 1970 request the attorney to prepare an application to the probate court for authority to sell any or all of the stocks in the estate? Answer: "The jury is unanimous in that executrix requested the attorney to take the necessary actions which would allow her to sell the stocks, yes."

5. Credibility of a witness means believability of a witness, in other words, which witness's testimony do you feel is more credible or believable, taken as a whole, the testimony of Mr. Murray or the testimony of Mrs. Yadon? Three jurors signed their names under Mr. Murray's name. Nine jurors signed their names under Mrs. Yadon's name.

The circuit court found that claimant's services and actions were not wrong, im-

proper or injurious to the estate; that the estate did not suffer economic loss as a direct result of wrong, improper or injurious actions on his part; that claimant did not wrongfully advise executrix that she could not sell the stocks on January 12, February 17 or April 6, 1970; that in January and February, 1970 executrix talked to claimant in general terms, and made requests of claimant of a general nature that the stocks be converted into street name in order for her to buy and sell in the stock market with proceeds of the estate, at times she deemed advisable, but made no request of claimant at any time to sell any particular stock for the purpose of conserving the estate. Disregarding the answers to interrogatories made by the advisory jury, and entering findings of fact and conclusions of law contrary thereto, the court awarded claimant an attorney's fee of $5,800. This appeal followed.

Both sides agree that in reviewing a case tried by the court with an advisory jury the appellate court is obligated to review the case upon both the law and the evidence; that the judgment shall not be set aside unless clearly erroneous, and that it is the reviewing court's duty to give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Appellant suggests, however, that where an advisory jury has returned a "verdict" contrary to that of the court the appellate court's duty to defer to the trial court's findings of fact diminishes, and urges that the court's findings be reviewed "with greater skepticism than [the court] normally employs in reviewing the facts in a court-tried case."

Due to the unfortunate manner in which the interrogatories were framed the advisory jury's answers were of little assistance in deciding this case. Instead of submitting definite questions calling for specific findings of fact, and without the jury having the benefit of instructions on the law relating to the duties and obligations of attorneys in advising clients in this field of the law, the first three interrogatories submitted questions of mixed law and fact, calling for legal conclusions with respect to the wrongfulness of the attorney's conduct. The only properly drawn interrogatory calling for a specific finding of fact was Interrogatory No. 4. Whatever slight value there may have been in the answers is clouded by the confusing fact that whereas the answers to the first four interrogatories were unanimously in favor of executrix on disputed questions of fact, three jurors in answering the fifth interrogatory indicated that *claimant's* testimony was the more credible.

Executrix testified as follows: In April 1969 she told claimant that the largest concentration of stocks in the estate was in a very volatile stock, Fedders, which she was advised by her broker to watch very carefully. In June, 1969 she told claimant that she was worried about market fluctuation and that she would not have control over the Fedders stock. She asked him to do something about having control so she could sell it if it looked like a good thing to do. In July, 1969 she learned that for an executrix to sell stock it had to be changed to street name to be negotiable, a process that took 2–3 weeks. At that time she requested of claimant that he get the stock in street name "so it would be negotiable immediately, and so forth, for professional management or to sell it and keeping [sic] the money in the estate, and, he said yes, he would do that." In September, 1969 he had not done it. He said that "he had found out you cannot sell the stock until twelve months after the date of [her] father's death." Executrix watched the stock market. She "constantly" worried about it and brought it up in conversations with claimant. On January 9, 1970 the stock reached the high point at which executrix' father had told her he was going to sell Fedders stock. On January 12 executrix told claimant she wanted to sell Fedders and asked him to "go talk to the judge about it." Claimant said only 11 months had elapsed since her father died and it could not be sold then; that they had to wait 15 months. Around the anni-

versary date, February 2, 1970, executrix again discussed the matter with claimant, pointing out that the stock market was going down; that the estate was "bouncing like a balloon in the wind." Claimant said he had to get court orders for her to do anything; that she could not get authority until the 15 months were up and that it now looked like she would not have control of the stocks for 2 or 3 years. The next day she suggested the stocks be sold and the money held in escrow. Claimant said it could not be done. When executrix threatened to go see the judge herself claimant agreed to talk to the judge about it. The next day claimant reported that the judge would let her keep a portion of the estate in escrow and deal with the rest of it at the end of the 15 months. On February 17 executrix, upset by an advisory report recommending getting out of the stock market, pleaded with claimant to do something about it, but claimant declined to do so. On April 6 she again asked him to "talk to the judge and try to get out of the stock market, the stocks are going down * * *." Claimant refused to act until May 2, the end of the 15-month period. When actually sold, without court order, between May 15 and May 28, 1970, the stocks netted the estate $150,400. If the stocks had been sold on January 12, 1970 they would have netted the estate $199,500. If sold on February 17, 1970, $190,000; if sold on April 6, 1970, $187,200. (All figures in nearest round numbers.)

Charles A. Cromwell, Jr. testified that on April 6, 1970 he told claimant that his sister was excited and concerned that the estate was losing money steadily because the stock market and their stocks were dropping and that she was most anxious to be able to sell the stock before they lost any more money, to which claimant answered that she could not do it; that the law would not allow it.

Executrix' broker testified that his firm's recommendation to her was that she try and eliminate some of the overconcentration in Fedders stock; to break it down in more pieces; that if she had sold the Fedders stock in 1969 it might have been reinvested in five different securities.

Edwin Raeder, who succeeded claimant as attorney for executrix, testified that a sale of the stocks could have been made within the first nine months following issuance of letters of administration, under the power in the will, which would have permitted the sale without a court order, or by an order of the probate court, which sometimes is obtained for protection; that a sale could be made during the first nine months even without a power in the will; that the probate court will rarely interfere with the discretion of the beneficiaries if they are desirous of converting stock on the stock market into cash.

Claimant testified as follows: Within a month after issuance of letters testamentary executrix informed claimant that the stocks in the estate were good stocks and that she wanted to hold on to them. From time to time there was general discussion of sale of the Fedders stock, but claimant was given no definite instructions that executrix wanted to sell. They discussed sale in the fall of 1969 but there was no insistence at that time that the stock be sold. Sometime in January, 1970 there was further discussion of sale of the stock. Claimant denied that at that time executrix told her that the Fedders stock had reached the point where her father had told her to sell and that she wanted to sell it. He said the discussion at that time related to the question whether the stocks ought to be liquidated before or after the estate was closed. In the earlier discussions in 1969 claimant told executrix that the probate court would have to authorize the sale of the stock but in the meantime he was informed to the contrary. Claimant testified that the will provided that executrix had a right to sell real or personal property in her sole discretion at any time without an order of the court. Claimant knew, however, that the Probate Court of St. Louis County took the position that the court would not honor such a provision in

a will with respect to personal property and stocks. He concluded that no court order was necessary, under the power in the will, and he so informed executrix in the fall or winter of 1969, prior to December 31 of that year. Testator's residence property and the stock in the closely held corporation had been sold under the power in the will, without court order, and these sales were never questioned. Claimant and executrix had a discussion in March or April, 1970 in which she stated that she wanted to sell stocks, but there were no definite instructions from executrix to "Get it ready to sell" until the first part of May, 1970. That was the first time executrix told claimant to sell the stock, whereupon claimant prepared the necessary papers to "take care" of the sale. (Getting "waivers from Jefferson City.") The stocks were sold without prior court approval. Claimant did not remember having advised executrix in March or April that the probate court would not permit a sale of the stock and that she wanted to go see the judge herself. Claimant denied having said he would go talk to the judge; denied calling her the next day and telling her the sale could be worked out by holding the proceeds in escrow; denied telling her that he would not be able to get court approval because there was no compelling need for money in the estate; denied that on April 6, 1970 claimant told Cromwell, Jr. that the stock could not be sold.

John L. Sullivan, an attorney specializing in probate practice, testified that a will does not become "final" until the 9-month period runs within which it may be contested; that while an executor, acting under a power in a will, can make a sale at any time, he does so at his peril, and the only way for him to protect himself from collateral attack is to procure an order of sale from the probate court.

We are not apprised of the exact wording of the power of sale, the will itself not having been reproduced in this record.

The circuit court, not bound by the answers given by the advisory jury, made extensive findings of fact. We concur in the first 22 findings of fact made by the circuit court touching the services rendered the estate by claimant, and his right to compensation therefor, and find the facts to be the opposite from the answers given by the advisory jury to the first three interrogatories.

Appellant's claim of error is grounded on the refusal of the court to find that claimant advised executrix that she could not sell stocks belonging to the estate, which appellant asserts was supported not only by the testimony of executrix but also by the testimony of claimant. Appellant argues that from this necessary finding it follows that the stock was not sold (and the estate therefore suffered financial detriment) because of claimant's advice to executrix.

■ We find from the evidence that at the outset of the administration of this estate claimant did advise executrix that the probate court would have to authorize the sale of the stock, but we further find that thereafter and before January 1, 1970 claimant changed his mind about the necessity of first obtaining court approval, and that prior to January 12, 1970, when executrix claims she definitely stated she wanted to sell the Fedders stock and directed claimant to "go talk to the judge about it," claimant advised executrix that no court order was necessary. We further find on controverted evidence that executrix did not communicate to claimant a definite determination on her part to sell the stock and did not direct him to take the necessary preliminary steps until early May, 1970, and that upon receiving this information and direction claimant promptly complied with her wishes.

Accordingly, although our findings do not coincide in all respects with those of the circuit court, that court reached the correct result and its judgment is not "clearly erroneous."

■ Notice of the appeal was given by "the Estate of Charles A. Cromwell, de-

ceased," which is not an entity with the capacity to be a party appellant. The capacity to be a party appellant reposes only in persons in being, natural or artificial. Farrar v. Moore, 416 S.W.2d 711[1] (Mo. App.1967); 67 C.J.S. Parties § 30. The personal estate of a decedent is not a legal entity. It cannot sue or be sued as such, and it cannot appeal as such. "In all proceedings against the estate of deceased persons the administrator or executor is an indispensable party." Eisiminger v. Stanton, 129 Mo.App. 403, 107 S.W. 460, 462 (1907). That case approved an appeal affidavit executed by the administrator as against the contention that it was fatally defective for not stating that the estate was aggrieved. The real party in interest —the party entitled to maintain this appeal on behalf of the estate—is its legal representative. The authority of Charles A. Cromwell, Jr. to defend this action and maintain this appeal is not a matter of record in this case. Appellant's brief relates but the record does not show that Mrs. Yadon resigned as executrix prior to the date of filing the notice of appeal and that Charles A. Cromwell, Jr. succeeded her by appointment as executor after that date. His name appears on the briefs as appellant, and the case has been appealed, briefed and argued as though he were the lawful party appellant, although he has no standing in this Court in the present state of the record. The situation is comparable to that encountered in Board of Public Works of Rolla v. Sho-Me Power Corp., 362 Mo. 730, 244 S.W.2d 55, 61–62[14, 15] (Mo. banc 1951). For the same reasons given in that case, if within fifteen days, by instrument of writing filed in this Court, Charles A. Cromwell, Jr., in his capacity as Executor of the Estate of Charles A. Cromwell, Deceased, adopts the notice of appeal, transcript of the record, exhibits and briefs, and asks to be substituted as party defendant and appellant herein, the notice of appeal, records, briefs and·judgment will be considered as amended in conformity therewith, and the judgment affirmed; otherwise the appeal is dismissed.

SMITH, C. J., and STOCKARD, Special Judge, concur.